IN THE MATTER OF THE SEIZURE            )
OF ONE 2005 PORSCHE CAYENNE             )
AND ALL ATTACHMENTS THERETO,            )
VIN:  WP1AA29P95LA24640,                )
REGISTERED TO MARTIN                    )
ROOSEVELT MCLAREN                       )

### AFFIDAVIT IN SUPPORT OF A SEIZURE WARRANT

PAUL CAVANAGH, being duly sworn, deposes and states as follows:

### INTRODUCTION

1. I am a Special Agent ("SA") employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for three (3) years. Currently, I am assigned to the Asset Forfeiture/Money Laundering Squad in the FBI's Washington, D.C. Field Office ("WFO"). My duties include investigating the asset forfeiture aspects of suspected violations of federal law, including money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, as well as, health care fraud, mail fraud, wire fraud, and bank fraud under Title 18, United States Code. I also investigate the asset forfeiture aspects of narcotics violations under Title 21, United States Code. I have received extensive training in advanced money laundering techniques and complex financial manipulation.

2. I am currently assisting SA Mark Dargis, FBI, WFO. SA Dargis is assigned to investigate health care fraud. The statements contained in this affidavit are based in part on reports and conversations provided by SA Dargis, other special agents of the FBI, special agents of the Office of Inspector General, United States Department of Health and Human Services ("OIG, HHS"), and other law enforcement officers who are familiar with this investigation. In addition, I have reviewed records and documents recovered on April 11, 2006, during the execution of search warrants pertaining to this case.

3. This affidavit is in support of a seizure warrant for the following item:

**One 2005 Porsche Cayenne and all attachments thereto,
VIN: WP1AA29P95LA24640,
Registered to Martin Roosevelt McLaren**

The information in this affidavit does not include each and every fact known to the government, rather it only includes information sufficient to establish that probable cause exists for a seizure warrant to be issued for property that represent proceeds of a violation of 18 U.S.C. § 1347 (Health Care Fraud), and/or proceeds of or property involved in a violation of 18 U.S.C. §§ 1956(a)(1) or 1957 (Money Laundering). Property that constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" as defined in section 1956(c)(7) of Title 18 is subject to seizure and forfeiture under 18 U.S.C. §§ 981(a)(1)(C) and 981(b) and property involved in or traceable to a money laundering transaction is subject to seizure and forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 981(b). Under Title 18, United States Code, Section 1956(c)(7)(F), the term "specified unlawful activity" includes any act or activity constituting an offense involving a Federal health care offense – including Health Care Fraud and False Statements Regarding Health Care Matters.

4. Based on my training and experience as described above, my personal participation in this and other financial investigations, and discussions with other federal and local law enforcement personnel who are knowledgeable of financial investigations and health care fraud investigations, I know that health care providers who submit fraudulent claims to health care programs, like Medicare:

      a. seldom restrict their fraudulent billing to one health care program;

      b. alter patients' files to support fraudulent claims;

    c. launder proceeds through various bank accounts; and

    d. bill health care benefit programs for services not rendered.

5. As discussed in detail below, the above-described vehicle is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as any property, real or personal which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1347, Health Care Fraud, or as proceeds traceable to any offense (or a conspiracy to commit such offense) constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c), and this vehicle is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property.

## BACKGROUND

6. Martin R. McLaren ("MCLAREN") is the owner of Pain Management Center ("PAIN MANAGEMENT"), located at 6475 New Hampshire Avenue, Suites 420 and 430, Hyattsville, Maryland. MCLAREN is a licensed anesthesiologist, specializing in pain medicine, and operates under the entity of McLaren Anesthesia Associates, PC. MCLAREN has patients who reside in both Maryland and the District of Columbia. The 2005 Porsche Cayenne is registered to 8521 Thornden Terrace, Bethesda, Maryland.

7. MCLAREN submits bills to various health care benefit programs, as defined in 18 U.S.C. § 24, including the Medicare program, the District of Columbia's Medicaid program, TRICARE, Aetna Insurance Company's health care benefit program ("AETNA"), and CIGNA.

## INVESTIGATION

8. The present investigation began when TriCenturion, a program safeguard contractor

3

for Medicare, sent a referral to the U.S. Department of Health and Human Services regarding MCLAREN. TriCenturion had conducted a proactive data analysis and determined that MCLAREN was overbilling for Toradol, an anti-inflammatory drug that is administered orally or by injection. Investigation reveals that from 2002 to 2006, MCLAREN (or McLaren Anesthesia Associates, PC.) caused Medicare to paid approximately $115,774 for Torodol injections in a scheme by which MCLAREN would cause inflated claims to be submitted for 375 milligram injections, in order to maximize the amount of reimbursement he was paid. In fact, the amount to Torodol injected was considerably less.

      9. In addition, I have been informed that MCLAREN submitted a high volume of claims relating to mylograph procedures that are rarely performed by a pain management specialist such as MCLAREN, and that are generally performed by radiologists in hospitals instead of medical offices. From 2002 through 2005, MCLAREN submitted over $2 million in claims to Medicare for this procedure and was reimbursed $700,000 for these claims. For the same period of time, he received $143,371 from AETNA, $41,822 from CIGNA, and $40,484 from TRICARE in reimbursements for mylograph procedures. I have been advised by SA Dargis that on April 11, 2006, during an interview, MCLAREN admitted that he does not perform mylograph procedures. Thus, MCLAREN was paid a total of $925,677 for medical procedures that he has admitted he did not perform. From January 2002 to January 2006, Medicare also paid approximately $323,355 to McLaren Anesthesia Associates, PC. for flouroscopy procedures that, investigation reveals, were not performed. MCLAREN has admitted that he did not perform these procedures for which he caused claims for reimbursement to be submitted to the above-described health benefit programs.

10. I have been informed that claims submitted to Medicare by MCLAREN during the time period from December 4, 2003, through December 10, 2003, were examined by investigators involved in this case. The records show that MCLAREN submitted or caused to be submitted 30 claims to Medicare claiming that he had personally provided medical services to different patients during this time period. MCLAREN submitted claims totaling $15,155, and was reimbursed $4,058.29. I have been informed that MCLAREN was in Barbados during that time period and could not have performed the services he claimed in his submissions to Medicare.

11. I have been informed that investigators involved in this case have examined claims submitted to Medicare by MCLAREN during the time period from November 7, 2005, through November 10, 2005. MCLAREN submitted or caused to be submitted approximately 124 claims to Medicare claiming that he personally performed medical services to different patients during this time period. MCLAREN submitted claims totaling $65,332.42, and was reimbursed $6,320.27. I have been informed that MCLAREN was in Barbados during that time period, and could not have performed the services he claimed in his submissions to Medicare.

12. This investigation has also uncovered the fact that MCLAREN settled a civil matter with AETNA. During the pendency of that dispute, AETNA requested various patient files from MCLAREN. I have learned that in response to AETNA's request, MCLAREN produced patients' files to AETNA in which all of the patients' vital signs, including blood pressure and pulse, were identical. I have learned that it is statistically almost impossible for various patients to have identical vital signs. Based on this information, I have inferred that it is likely that those patients' files were altered as a result of AETNA's investigation of MCLAREN's billings to

AETNA.

    13. I have been advised that MCLAREN has submitted Medicare claims far in excess of his peers in the Mid-Atlantic pain management field. For example, in 2005, MCLAREN caused Medicare alone to be billed approximately $6.6 million in claims. In 2004, he caused Medicare alone to be billed approximately $7 million in claims. I have been advised by special agents who are experienced in investigating health care fraud and who are involved in this investigation that these volumes of claims are far in excess of MCLAREN's peers' claims and are highly suggestive of false billing.

    14. I have been informed that MCLAREN has issued a large volume of prescriptions for controlled narcotics, particularly for Oxycontin and Percocet. On April 11, 2006, during an interview of MCLAREN's billing manager, investigators were told by the billing manager that many of MCLAREN's patients are "crackheads." I have been advised that, during the execution of a search warrant on MCLAREN's residence on April 11, 2006, special agents observed stacks of U.S. currency in various places in MCLAREN's residence. MCLAREN told the special agents that this currency was from co-payments made by his patients. MCLAREN stated that he saved the co-payments up and then deposited them at one time. It is estimated that these stacks of U.S. Currency totaled approximately $20,000-$25,000. In addition, I have been advised that special agents, while executing a search warrant at MCLAREN's residence, observed numerous blank prescription pads and prescriptions in the names of MCLAREN's employees. MCLAREN told investigators that he had written prescriptions for his employees for medical reasons, but that they had not used them. Based on my experience and discussion with investigators who investigate health care fraud, doctors who are selling prescriptions for narcotics to drug addicts,

often charge health care programs for office visits when the drug addicts only come into the doctor's office to obtain/purchase their narcotics prescriptions.

## TRACING THE PROCEEDS

15. SA Dargis contacted the D.C. Department of Health, Medical Assistance Administration ("MAA"), and requested information regarding MCLAREN's past Medicaid billings. An MAA investigator advised that in 2004, MCLAREN billed Medicaid in excess of $700,000, with nearly all billed items and procedures rejected by MAA. MCLAREN was reimbursed only $20,000 for this time period by MAA.

16. SA Dargis' review of MCLAREN's billing for Medicare shows the following:

| Year | Amount billed | Amount Denied | Amount Paid |
|------|---------------|---------------|-------------|
| 2002 | $1,531,617,45 | $1,256,698.23 | $204,159.66 |
| 2003 | $5,453,067.75 | $4,236,793.87 | $918,045.03 |
| 2004 | $7,002,616.65 | $5,421,666.66 | $1,239,049.19 |
| 2005 | $6,648,660.59 | $5,390,316.79 | $984,196.14 |

17. The investigation of MCLAREN indicates that he does not have any other known legitimate source of income and that his main income is derived from his pain clinic. I have identified 16 bank accounts and investment accounts at Wachovia Bank, Bank of America, and TIAA-CREF Mutual Funds, associated with MCLAREN, his wife, his children, and his business. Some of these accounts contain millions of dollars. MCLAREN's wife works at PAIN MANAGEMENT. From records I reviewed, she receives approximately $90,000 per month. Records indicate that in 2004, MCLAREN paid his wife approximately $820,000 per year from McLaren Anesthesia Associates, PC's Bank of America Account No. XXXXXX7669. On April 11, 2006, MCLAREN told investigators that his wife's job at PAIN MANAGEMENT was to take dictation.

## The 2005 PORSCHE CAYENNE

18.   MCLAREN's business account for PAIN MANAGEMENT, Account No. XXXXXX7669 is a Bank of America account and is held in the name of McLaren Anesthesia Associates, PC.  On April 11, 2006, MCLAREN told investigators that the reimbursements for his billings to Medicare, Medicaid, and private insurance companies were deposited into Bank of America Account No. XXXXXX7669.  I have reviewed bank records which show transfers of monies and payments from the Bank of America business account in the name of McLaren Anesthesia Associates, PC.  I have also reviewed vehicle purchase documents that show that MCLAREN purchased the subject 2005 Porsche Cayenne from Tischer Auto Park on April 13, 2005, for the purchase price of $48,199.  MCLAREN made the following payments regarding the subject 2005 Porsche Cayenne from the business account in the name of McLaren Anesthesia Associates, PC:

| DATE | Check No. | AMOUNT | PAYEE |
| --- | --- | --- | --- |
| April 13, 2005 | 2672 | $ 10,000 | Tischer Auto Park |
| June 14, 2005 | 2774 | $ 5,000 | Porsche Financial Services |
| July 21, 2005 | 2825 | $ 20,000 | Porsche Financial Services |
| August 15, 2005 | 2868 | $ 4,000 | Porsche Financial Services |
| September 20, 2005 | 2936 | $ 3,500 | Porsche Financial Services |

The payments made from this account and used to purchase/finance the Porsche came during the period that the Health Care Fraud scheme described herein was ongoing and not long after proceeds of MCLAREN's fraudulent health care billing scheme had been deposited into the Bank of America business account in the name of McLaren Anesthesia Associates, PC.  The above-described withdrawals thus constitute or are traceable to proceeds of MCLAREN's

scheme to defraud.

    19. I am advised that, in pertinent part, 18 U.S.C. 984(b) provides:

> (1) In any forfeiture action in rem in which the subject property is cash [or] funds deposited in an account in a financial institution -
>
>> (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
>>
>> (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.
>
> (2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

I am advised that, in essence, Section 984 allows the United States to seize for civil forfeiture identical ("fungible") property found in the same place where the "guilty" property had been kept. See United States v. All Funds Presently on Deposit at American Express Bank, 832 F. Supp. 542, 558 (E.D.N.Y. 1993). I am further advised that the "fungibility" rule of Section 984 cannot reach back in time for an unlimited period. Section 984(b) provides: "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense."

    20. I am advised that Title 18, United States Code, Section 981(b)(3), provides that "a seizure warrant may be issued . . . by a judicial officer in any district in which a forfeiture action against the property may be filed under Section 1355(b) of Title 28, *and may be executed in any district in which the property is found . . . ."* Inasmuch as the property subject to forfeiture is moveable and frequently located in Maryland, and because some of the health care fraud activities described herein occurred in the District of Columbia, this District Court may issue and

cause to be served in Maryland or in any other district, the requested seizure warrant.

## CONCLUSION

21.     In summary, based on the foregoing information, and upon my training and experience, there is probable cause to believe that MCLAREN committed the offense of Health Care Fraud, in violation of 18 U.S.C. § 1347, and that the subject 2005 Porsche Cayenne and all attachments thereto, VIN No. WP1AA29P95LA24640, registered in the name of Martin Roosevelt McLaren, and purchased with funds from Bank of America Account No. XXXXXX7669, in the name of McLaren Anesthesia Associates, PC, is traceable to proceeds obtained by MCLAREN through health care fraud in violation of 18 U.S.C. § 1347 (a specified unlawful activity), and laundered by MCLAREN, and is, therefore, subject to seizure and forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and (C), in that this subject vehicle represents property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1347, and, in that this subject vehicle represents property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957 (Money Laundering), or property traceable to such property.

                                                                   _____
                                                                   Paul M. Cavanagh, Special Agent
                                                                   Federal Bureau of Investigation
                                                                   United States Department of Justice

SWORN TO AND SUBSCRIBED before me this _____ day of April, 2006

_____
      United States Magistrate Judge
      for the District of Columbia